FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

01 FEB -6 PM 3:58

U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED
FEB - 6 2001

HEAFNER TIRE GROUP, INC., }
     }
    Plaintiff, }
     }   CIVIL ACTION NO.
v. }
     }   01-AR-0229-S
AM-PAC TIRE DIST., INC., et }
al., }
     }
    Defendants. }

**MEMORANDUM OPINION**

In this action plaintiff, Heafner Tire Group, Inc. ("Heafner"), seeks injunctive relief, monetary damages and attorneys' fees based on what Heafner claims is a breach by defendant Michael E. Griffin ("Griffin") of an employment agreement that contains a non-compete provision, and what Heafner claims is a violation of the Alabama Trade Secrets Act by Griffin and defendant Am-Pac Tire Distributors, Inc. d/b/a Progressive Tire Company ("Progressive"), and what Heafner claims is a tortious interference by Progressive with Heafner's contractual relations with Griffin. One question is crucial to the decision as to whether injunctive relief is called for: Did Griffin's conduct violate any obligations created by two written documents, namely, an "Employment Letter of Understanding" and an "Agreement not to Compete". Both were signed by Griffin and were witnessed by George Bender ("Bender"), Heafner's Southeastern Regional Vice President.



On January 23, 2001, Heafner filed its complaint in this court. Heafner first sought a temporary restraining order, claiming irreparable injury and a need for immediate injunctive relief. Instead of granting or denying a T.R.O., the court set the case for a preliminary injunction hearing on January 30, 2001, and suggested the serious possibility of advancing the case for a final hearing on the merits insofar as any injunctive relief is concerned. The hearing was held on January 30 and 31, 2001. Because the evidence presented in support of and in opposition to a preliminary injunction is the same evidence that could be expected at an eventual trial on whether to issue a permanent injunction, and because the parties agreed to the procedure, the request for a preliminary injunction was consolidated with a trial on the merits insofar as the injunctive relief is concerned. This was done pursuant to Rule 65(a)(2), F.R.Civ.P., as well as by consent. For the reasons set forth in this opinion, Heafner's prayer for a permanent injunction will be granted.

### FINDINGS OF FACT

Heafner is a wholesale distributor of tires and automotive products headquartered in North Carolina, with locations in Alabama and throughout the United States. Progressive is a wholesale tire distributor engaged in business throughout the southeastern United States. The two are in direct competition with each other in

2

Alabama and elsewhere. On January 13, 1999, Heafner named Griffin as Assistant General Manager for its Cullman, Alabama distribution facility. Upon assuming his said position, Griffin signed a contract with Heafner, entitled "Employment Letter of Understanding". It provides, in relevant part:

> 2. Necessary Services: You agree to perform all duties assigned, at all times, faithfully, industriously, to the best of your ability and talents, and to the reasonable satisfaction of the Company. During the period of your employment, your services will be provided exclusively to the Company and you will not engage in other businesses as director, employee, and/or consultant without the prior written consent of the President, Chief Operating Officer, or the Chief Executive Officer of the Company.
>
> * * *
>
> 5. Confidentiality: You keep in strictest confidence all information and knowledge you have of business affairs, customers, and suppliers of the Company. During the term of your employment and at all times thereafter you shall not disclose any such information without prior written consent of the Company.
>
> 6. Non Compete: You will be asked to sign the attached Non-Compete as a condition of employment.

An "Agreement Not to Compete", was also signed by Griffin on the same date. It provides, in relevant part:

> 2. Employee hereby agrees that for the duration of Employee's employment with Employer and for a period of one (1) year thereafter if Employee voluntarily terminates

3

employment with Employer or Employer terminates Employee for criminal malfeasance with respect to property belonging to the Company, Employee will not in any manner directly or indirectly:

> (a) Engage (as an individual, . . . Employee or representative of any person, firm, corporation or association), or have any interest, direct or indirect, in any business in competition with business of Employer, as that business is constituted during the last year of the Employee's employment or at any time of the employee's tenure with the company, within a seventy-five (75) mile radius of the Distribution Center where the Employee is employed.
>
> (b) Disclose or divulge to any person, entity, firm or company whatsoever or use for Employee's own benefit or for the benefit of any person, entity, firm or company, directly or indirectly in competition with Employer, any knowledge, information, business methods, techniques or customer lists of Employer;
>
> (c) Solicit, divert, take away or interfere with the customers, patronage, employees or agents of Employer.

In addition, the non-compete agreement provides Heafner with the remedies of injunctive relief and specific performance should Griffin violate the agreement. Lastly, the agreement contains a choice of law provision that says: "This agreement shall be interpreted, construed and governed according to the laws of the State of North Carolina."

On December 27, 2000, Griffin resigned his position as

4

Assistant General Manager with Heafner for the avowed purpose of taking a position as General Manager with Progressive at a location within a seventy-five (75) mile radius of Heafner's Cullman, Alabama facility. On December 28, 2000, upon discovering Griffin's plans, Heafner wrote a letter to Griffin reminding him of his obligations under the terms and conditions of the non-compete agreement, and telling him that "Heafner intend[ed] to enforce the terms of that Agreement and to pursue all remedies available to Heafner under said Agreement". Griffin's supervisor at Cullman also verbally warned Griffin of the possible consequences of what he was about to do. Further, Heafner sent a letter to John Abernathy ("Abernathy"), President of Progressive, advising him that Griffin had signed the non-compete agreement (of which Abernathy was already aware), and that "any offer of employment in violation of the terms of [Griffin's] agreement not to compete will expose [Progressive] to legal liability."

As of the date of the hearing conducted on January 31, 2001, Griffin was still employed by Progressive. If Griffin's agreement with Heafner is enforceable, Griffin is violating it. The court agrees with Heafner that "Griffin has solicited and attempted to divert customers of Heafner." Solicitation can be subtle and still constitute solicitation. It is not necessary for the court to agree or to disagree with Heafner that Griffin "has stolen

5

proprietary information which was maintained confidentially by Heafner." Pla. Brief, at 5. Heafner's contention that Progressive has harmed Heafner by inducing Griffin to violate the non-compete agreement is a question that will remain for another day.

Griffin's contention that he did not voluntarily resign and instead was constructively discharged was not proven by him. While the court finds that Griffin's future opportunities with Heafner may have been substantially less than those he would have with Progressive, and that Griffin may even have "topped out" salary-wise at Heafner's Cullman facility, the conditions of his employment with Heafner were not intolerable, much less so intolerable as to lend legitimacy to a description of his departure from Heafner as involuntary, or an undeserved termination.

Progressive's contention that the non-compete agreement was without consideration is also without merit. Griffin not only was given a promotion contemporaneously with his execution of the agreement, but the agreement itself gave him protection against arbitrary termination that his previous "at will" employment status did not afford. This clearly constituted contemporaneous, substantive consideration.

While it is impossible to quantify precisely the adverse impact, if any, upon Heafner of Griffin's activities on behalf of Progressive, the contract itself, by express design, concedes that

6

much harm will occur if Griffin works for a competitor in the same market. Furthermore, there has been some actual harm, however small.

Griffin does not contend that he has no marketable skills except for marketing tires within 75 miles of Cullman, Alabama. Although the economic impact of an injunction upon him will be hurtful, it is the product of a risk he took with his eyes wide open when he ignored the clear language of his agreement. Giving him the benefit of the intelligence he displayed on the witness stand, he must think that if Heafner succeeds in enforcing the non-compete agreement, he can still make a living.

### CONCLUSIONS OF LAW

The court has subject matter jurisdiction under 28 U.S.C. § 1331, because of the complete diversity of the parties and the requisite jurisdictional amount.

When this court was a neophyte lawyer one year out of law school, he learned that covenants not to compete are enforceable in Alabama if they are reasonably limited in time and area. See *McNeel Marble Co. v. Robinette*, 259 Ala. 66, 65 So.2d 221 (1953), in which this court, as the lawyer who represented the party there seeking to enforce such a covenant, succeeded in obtaining its enforcement. Many years later, this court learned the same lesson all over again, the hard way, when it was reversed by the Eleventh

Circuit in *Nationwide Mutual Insurance Co. v. Cornutt*, 907 F.2d 1085 (11th Cir. 1990), a case in which this court let its super-sensitivity to the plight of a former employee who violated a similar covenant, overwhelm what he learned in *McNeel Marble*.

### Choice of Law

At the outset, the court must determine whether North Carolina or Alabama law governs the substantive aspects of the non-compete agreement. According to Heafner, the agreement should be governed by the substantive law of North Carolina pursuant to the choice of law provision set out in the contract. Defendants contend that Alabama law should control because applying the substantive law of North Carolina would be contrary to Alabama's public policy against covenants not to compete.

The law of Alabama concerning choice of law principles is well-settled. In *Ex Parte Owen*, 437 So. 2d 476, 481 (Ala. 1983), the court held: "Alabama follows the traditional view that a contract is governed as to its nature, obligation, and validity by the law of the place where it was made, unless the parties intend the law of some other place to govern, or unless it is to be wholly performed in some other place." See also *Morris v. SSE, Inc.*, 912 F.2d 1392, 1396 (11th Cir. 1990) ("In contract actions, Alabama applies the rule of *lex loci contractus*."); *Hughes Associates Inc. v. Printed Circuit Corp.*, 631 F. Supp. 851, 854 (N.D. Ala. 1986);

8

*New York Life Ins. Co. v. Scheuer*, 73 So. 409, 413 (1916) (noting that, "it is quite plain that the contract . . . was, when made, and has continued to be, a New York contract, subject to the applicable laws of that state, . . . and certainly not an Alabama contract.").

This particular agreement clearly provides for a choice of law. It says that it "shall be interpreted, construed and governed according to the laws of the State of North Carolina." While Alabama, as do most other states, disfavors restraints of trade, "the Alabama courts will enforce a noncompete agreement if it (1) falls within a statutory exception to the general prohibition, and (2) is reasonably limited as to territory, duration, and subject matter." *Nationwide Mutual Insurance Co. v. Cornutt*, 907 F.2d 1085, 1087 (11th Cir. 1990). *See also McNeel Marble Co. v. Robinette*, 259 Ala. 66, 65 So.2d 221 (1953); *Picker International, Inc. v. Parten*, 935 F.2d 257, 2601-61 (11th Cir. 1991). The "general prohibition" can be found at Alabama Code § 8-1-1(a), and the "statutory exception" is set forth in § 8-1-1(b):

> a) Every contract by which anyone is restrained from exercising a lawful profession, trade or business of any kind otherwise than is provided by this section is to that extent void.
>
> b) One who sells the good will of a business may agree with the buyer and one who is employed as an agent, servant or employee may

9

> agree with his employer to refrain from carrying on or engaging in a similar business and from soliciting old customers of such employer within a specified county, city, or part thereof so long as the buyer, or any person deriving title to the good will from him, or employer carries on a like business therein.

Ala. Code § 8-1-1 (1984).

Heafner cites a number of other Alabama cases in which non-compete agreements have been enforced when they were reasonable as to territory and duration. *See, e.g., American Express Financial Advisors, Inc. v. Knox*, 1998 U.S. Dist. LEXIS 14018 (S.D. Ala. 1998); *Kemper v. Cox & Assoc., Inc.*, 434 So. 2d 1380 (Ala. 1983); *Booth v. WPMI Television, Co.*, 533 So. 2d 209 (Ala. 1989); *Affiliated Paper Companies v. Hughes*, 667 F. Supp. 1436 (N.D. Ala. 1987). Not only does the court find these cases persuasive, but the cases also indicate that the public policy of Alabama would not be violated if the court should enforce the choice of law provision.

Whether the application of North Carolina law would run afoul of the public policy of Alabama law is the next question. Under North Carolina law, a court will enforce a non-compete agreement "if it is (1) in writing; (2) made part of a contract of employment; (3) based on valuable consideration; (4) reasonable both as to time and territory; and (5) not against public policy."

*Reynolds and Reynolds Co. v. Tart*, 955 F. Supp. 547, 553 (W.D.N.C. 1997) (citing *United Laboratories v. Kuykendall*, 370 S.E.2d 375, 380 (N.C. 1988)). It is clear to this court that the North Carolina law governing the enforceability of non-compete agreements is virtually identical to the Alabama law, and therefore, that the public policy of Alabama will not be compromised by enforcing the parties' choice of law provision. Accordingly, pursuant to the choice of law provision in the agreement and the general rule in Alabama interpreting such provisions, the agreement will be construed in accordance with North Carolina substantive law.

### Is Heafner Entitled to Injunctive Relief?

Like Alabama, North Carolina disfavors restraints of trade. North Carolina courts, however, will enforce a covenant not to compete where it (1) protects the legitimate business interests of the employer, (2) imposes no undue hardship on the employee, and (3) upholds public policy. *See United Laboratories,* 370 S.E.2d at 379. As a general rule, courts have denied the relief of enforcement where the agreement is found to be harsh, unjust, or unreasonable; that is, where the agreement fails to satisfy one or more of the criteria insuring its validity. *See* 43A C.J.S. Injunctions § 95 (1978).

In the instant case, Heafner has proven that the non-compete agreement is in writing, reasonable as to time and territory, is

part of the employment contract, is based on valuable consideration, and is designed to protect Heafner's legitimate business interests. *See A.E.P. Industries v. McClure*, 302 S.E.2d 754, 762 (N.C. 1983)(enforcing a non-compete agreement which restricted defendant from employment within a 300 mile radius of plaintiff's location for a period of 18 months). Lastly, enforcing the agreement will not violate public policy. "Public policy does not intend that another than the producer shall reap the fruits of labor. Rather it gives to him who labors the right by every legitimate means to protect the fruits of his labor and secure the enjoyment of them to himself." *Id*. at 763. Because the court finds that this covenant not to compete is reasonable under the totality of the circumstances, Heafner is entitled to an injunction, that is, unless there is no possibility that it could suffer harm from Griffin's violation. The court has already found that Heafner has been harmed or that there is a substantial potential for harm if the agreement is not enforced.

A separate order of injunction will be entered.

DONE this 6th day of February, 2001.

/s/ William M. Acker

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE